**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:06cv537**

| | |
|---|---|
| **LUCAS E. LOPEZ-GALVAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **MENS WEARHOUSE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for

Summary Judgment [Doc. 20], filed on May 12, 2008.

**INTRODUCTION**

The Plaintiff Lucas E. Lopez-Galvan filed this action against his

former employer, the Defendant The Men's Wearhouse, Inc. (identified in

the Complaint as "Mens Wearhouse"), asserting claims of racial and

national origin harassment and constructive discharge in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII"),

42 U.S.C. §1981, and the public policy of North Carolina.  In addition to

these claims, the Plaintiff asserts claims for unpaid overtime compensation under both federal and state law, as well as state law claims for negligent supervision, negligent infliction of emotional distress, and intentional infliction of emotional distress. [Doc. 2]. This Court has original jurisdiction of the Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1343, and 42 U.S.C. §2000e-5(f)(3) and exercises supplemental jurisdiction of the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

After carefully considering the Defendant's Motion for Summary Judgment and Memorandum filed in support thereof [Docs. 20, 21], the Plaintiff's Response [Doc. 38], the Defendant's Reply [Doc. 39], as well as the entire record in this case, the Court concludes that summary judgment in favor of the Defendant is appropriate as to all of the Plaintiff's claims. Accordingly, the Defendant's Motion for Summary Judgment [Doc. 20] is granted, and this action is hereby dismissed.

## THE SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine issue of material fact rests with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inferences in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Id., at 248, 106 S.Ct. at 2510. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52, 106 S.Ct. at 2512.

## FACTUAL BACKGROUND

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite the relevant facts in the light most favorable to the Plaintiff, drawing all reasonable inferences in his favor.

**I. The Parties**

The Plaintiff is a native of the Dominican Republic. [Deposition of Lucas E. Lopez-Galvan, Volume I ("Lopez Dep. Vol. I"), Doc. 22-2 at 24]. His ethnicity is Latino or Hispanic. [Doc. 2 at 5]. The Plaintiff lived in Puerto Rico for thirteen years before coming to the continental United

States in March 2005.  [Lopez Dep. Vol. I, Doc. 22-2 at 14, 20].  The

Plaintiff's native language is Spanish; while he understands some English

vocabulary, he cannot speak English sentences.  [Id. at 23].  For his

deposition, the Plaintiff required the services of an interpreter; he estimated

that he understood only approximately two percent of the English spoken

during his deposition.  [Id. at 8, 23-24].

The Defendant operates a national chain of men's clothing stores,

with several stores throughout the Southeastern United States.

[Complaint, Doc. 2 at ¶5].  The Defendant sells primarily men's suits and

associated garments.  [Affidavit of Nitin Bulsara ("Bulsara Aff."), Doc. 24 at

¶3].  In June 2005, the Defendant hired the Plaintiff as a tailor for the

Defendant's store located at the University Target Plaza in Charlotte, North

Carolina ("University Target store").  [Lopez Dep. Vol. I, Doc. 22-2 at 62,

74].  The Plaintiff was hired by Regional Tailor Nitin Bulsara ("Bulsara").

[Bulsara Aff., Doc. 24 at ¶2].  At the time of his hire, the Plaintiff's direct

supervisors were Assistant Manager David Smith ("Smith"); Store Manager

Greg Schaub ("Schaub"); and District Manager Daniel Davenport

("Davenport").  [Affidavit of David Smith ("Smith Aff."), Doc. 27 at ¶1;

Affidavit of Greg Schaub ("Schaub Aff."), Doc. 32 at ¶1; Affidavit of Daniel

Davenport ("Davenport Aff."), Doc. 25 at ¶1]. In December 2005, Schaub was replaced by Jeffery Vance ("Vance") as the Store Manager of the University Target Store. [Affidavit of Jeffery Vance ("Vance Aff."), Doc. 30 at ¶1]. In addition to these supervisors, the Plaintiff regularly worked with Scott Cobb ("Cobb") and Bobby Murphy ("Murphy"), who were members of the sales staff, as well as Lana Goncharova ("Goncharova"), who, like the Plaintiff, worked at the University Target store as a tailor. [Affidavit of Scott Cobb ("Cobb Aff."), Doc. 28 at ¶1; Affidavit of Bobby Murphy ("Murphy Aff."), Doc. 29 at ¶1; Bulsara Aff., Doc. 24 at ¶4].

The Defendant's stores, including the University Target store, typically have a sales area in front that is open to the public and a "tailor area" in the back that is closed to the public. [Bulsara Aff., Doc. 24 at ¶3]. The Defendant strives to have at least one tailor on site during business hours to assist with alterations. [Id.]. During the process of marking alterations, the customer wears the newly purchased garment, and the person making the alterations must communicate with the customer or the salesperson about the customer's preferences or make suggestions about the fitting. [Id.]. The tailor then performs the alteration work. [Id.].

## II. Plaintiff's English Fluency

After the Plaintiff was hired, he took part in a new-employee orientation. [Davenport Aff., Doc. 25 at ¶4]. Because of his lack of English fluency, the Plaintiff was allowed to have his wife, who is fluent in English, sit in with him and help him through the orientation process. [Lopez Dep. Vol. I at 69].

Recognizing that it is not uncommon for good tailors to lack adequate English-language skills, Bulsara did not consider the Plaintiff's lack of fluency in English to be a problem in hiring him. [Bulsara Aff., Doc. 24 at ¶5]. Bulsara, a native of India for whom English is a second language, was able to speak some Spanish and thus communicate with the Plaintiff to a certain extent. [Id.]. The Plaintiff's almost complete lack of English language skills made it difficult, if not impossible, however, for him to communicate with customers and co-workers who were not able to speak Spanish. [Id.]. Consequently, many of the salespeople preferred to use Goncharova – who, while a native of Russia, is fluent in English – to deal directly with their customers. [Id.]. Bulsara did not consider this to be a problem for the Plaintiff because he was still needed to perform tailoring

work, and the fact that he was not dealing directly with customers as often as Goncharova was not a factor in determining his pay.  [Id.].

## III.    Alleged Acts of Harassment and Discrimination

In his deposition, the Plaintiff described his race as Latin, and he specifically denied being black; however, he testified that he was referred to as being black by others at the University Target store on two occasions. [Lopez Dep., Vol. I, Doc. 44-2 at 24, 25].  The Plaintiff further testified that although he is Dominican, Assistant Manager Smith wrongfully perceived him to be Puerto Rican and therefore "didn't treat [him] very well."  [Id. at 105].  For example, the Plaintiff testified that Smith once commented that he used to work with a Puerto Rican whose initials spelled "shit."  [Id.].[1] The Plaintiff further testified that Smith would lock the Plaintiff in the store while Smith went to the bank to make deposits.  Speaking through an interpreter, the Plaintiff testified as follows:

> A.    ... And one time I showed up at work and they jailed me there.  They had me all handcuffed and everything, chained.
>
> Q.    Who had you jailed?  I'm not sure I'm understanding this.

---

[1] Smith denies having ever made such a comment.  [Smith Aff., Doc. 27 at ¶3]. For the purposes of this motion, however, the Court must accept the Plaintiff's version of the facts as true.

A.     David Smith, almost always.  If he had to go on the corner – the Bank of American [sic] on the corner, he would pull the door closed with a lock and chain.

Q.     Okay, what are you talking about though, jailing?  Why did you use the reference to jail?

A.     I didn't say jailed.  I'm with a chain and lock. He left me locked up.  He left me locked up.

[Id. at 204].

In the fall of 2005, the Plaintiff was talking with Bobby Murphy, a salesperson who was trying to learn Spanish.  [Lopez Dep. Vol. I, Doc. 22-2 at 115].  Cobb overheard their conversation and told the Plaintiff, "Don't talk like that.  No Spanish here.  You're in the United States.  You have to speak English."  [Id.].[2]  On another occasion, the Plaintiff was working with a bilingual customer on the sales floor.  According to the Plaintiff, when the customer asked him about the sleeves, Cobb interrupted, saying, "No, no.

---

[2]Cobb denies making this comment, [Cobb Aff., Doc. 28 at ¶4], and the Defendant argues that, given the Plaintiff's inability to speak and understand English, it is unclear how the Plaintiff managed to comprehend Cobb's alleged statement.  In fact, during the Plaintiff's deposition, Defendant's counsel repeated Cobb's alleged statement to the Plaintiff in English and asked the interpreter not to translate the statement.  The Plaintiff testified that he did not understand what counsel had said.  [Lopez Dep. Vol. I, Doc. 22-2 at 198-99].  The Plaintiff argues, however, that a reasonable jury could find that the Plaintiff understood sufficient English and had sufficient facility with the English language as to know that he was being insulted and ridiculed. [Doc. 38 at 8].  Even though this may stretch the boundaries of what is a reasonable inference and what a reasonable jury could believe, for the purposes of this motion, the Court will assume that the Plaintiff understood the statements made to him.

Don't talk to him. He doesn't know English. He doesn't know anything. He's not good for anything. He's worthless. He doesn't speak English." [Lopez Dep. Vol. I, Doc. 22-2 at 156]. The Plaintiff reported this incident to Bulsara, who said he would talk to Cobb. The Plaintiff, however, does not know if Bulsara ever did so. [Id. at 157]. Bulsara claims that he did in fact speak to Cobb, who denied having made the comment. [Bulsara Aff, Doc. 24 at ¶11a].

The Plaintiff testified that "every second" he was called "dumb" and "stupid" by Bulsara's daughter, Kingel Bulsara, who was working at the store part-time while attending college. [Lopez Dep. Vol. I, Doc. 22-2 at 159-60, 108]. The Plaintiff complained about this behavior to Bulsara and asked to be transferred to a different store. [Id. at 160-61]. Bulsara spoke to his daughter about these comments. [Bulsara Aff., Doc. 24 at ¶11d]. Kingel Bulsara denied having called the Plaintiff "stupid," but told her father that the Plaintiff did not do his fair share of the tailoring work, leaving most of it for the other tailor, Goncharova. [Id.]. Further, Kingel told her father that the Plaintiff was "very unfriendly to both customers and employees and that some of the employees were afraid of him." [Id.].

The Plaintiff testified that his co-workers would not speak to him and that "[t]hey segregated from" him. [Lopez Dep. Vol. I at 114]. He also testified that Goncharova was called out onto the sales floor more often and as a result was given more "opportunities" and "privileges" than the Plaintiff. [Lopez Dep. Vol. II at 19]. The Defendant does not dispute that the sales staff preferred to use Goncharova instead of the Plaintiff for fittings because fittings required the tailor to interact with the customer, and Goncharova, although a native of Russia, spoke fluent English. [Bulsara Aff., Doc. 24 at ¶5; Cobb Aff., Doc. 28 at ¶3]. Also, the other employees perceived the Plaintiff as overly sensitive and quick to take offense. [Bulsara Aff., Doc. 24 at ¶¶6,7]. Bulsara himself described the Plaintiff as a "high-maintenance employee" who was "extremely sensitive, and took offense almost at the drop of a hat." [Id. at ¶6]. Bulsara noted that the Plaintiff "sometimes ... interpreted things unfavorably even when it was not rational to do so." [Id.]. Although Bulsara counseled the Plaintiff about this numerous times, Bulsara did not believe that he ever gotten through to him. [Id.]. Bulsara also noted that the Plaintiff "spent inordinate amounts of time during the work day on personal cell telephone calls." [Id. at ¶8]. Bulsara observed that the Plaintiff wore a "Bluetooth" earpiece device and

was frequently on personal calls while doing tailoring work, including while taking customers' measurements. [Id.]. Bulsara informally counseled the Plaintiff about his conduct and told him that he was not to use the Bluetooth while on duty. [Id.]. The Plaintiff told Bulsara that he thought there was no difference between his use of the Bluetooth and Bulsara wearing eyeglasses. [Id.]. The Plaintiff denies that he used his cell phone inordinately, but testified that he ceased using the Bluetooth immediately after Bulsara counseled him about it. [Lopez Dep., Vol. I at 161].

## IV. Alleged Pay Improprieties

All of the employees at the University Target store record their hours worked in a computer database. [Affidavit of Eric P. Lundblad ("Lundblad Aff."), Doc. 26 at ¶2]. When store employees come to work, they log onto a computer in order to "clock in." [Id. at ¶4; Lopez Dep. Vol. I at 145-46; Doc. 22-4, Ex. 13]. Employees clock in and out for lunch, and then clock out at the end of the day. Id.

The Plaintiff alleges that the Defendant failed or refused to pay the Plaintiff for the overtime hours that he worked. [Id. at 124]. In his deposition, the Plaintiff testified that he would stay 30 or 45 minutes after his shift ended in order to complete alterations for customers, but that he

was never compensated for this overtime.  [Id.].  The Plaintiff further testified that the company had altered his time as recorded in the company's computer system in order to pay him less money.  [Id. at 146, 153].  He testified that when he logged into the store's computer in order to clock in, he would see that his hours had been changed. [Id.].  Although the Plaintiff claimed to have written down these changes, he testified that he threw out these papers. [Id. at 146-47].

## V.  Events Leading to the Plaintiff's Resignation

In December 2005, the Plaintiff's wife called District Manager Davenport to complain on behalf of the Plaintiff that he was being harassed and discriminated against at work.  [Davenport Aff., Doc. 25 at ¶5]. Davenport scheduled a meeting with the Plaintiff and the Plaintiff's wife, as well as Jeff Vance, the store manager.  [Id.].  In the meeting, with Mrs. Lopez acting as interpreter, the Plaintiff complained, among other things, that Goncharova was getting used more for alterations on the sales floor than the Plaintiff.  [Id.].  Davenport agreed to require the store to put the Plaintiff and Goncharova on a rotation for customer contacts so that the sales personnel would alternate between the two tailors.  [Id.].  The Plaintiff appeared to be pleased with this resolution.  [Id.].  The Plaintiff admitted

that things were "fine" at work immediately following this meeting.  [Lopez Dep. Vol. I, Doc. 22-2 at 184].

Conditions did not remain so for long, however.  On Friday, January 6, 2006, the Plaintiff began to experience chest pain, which he attributed to "the hostility [he] was feeling" at work.  [Id. at 185].  The Plaintiff testified that he told Vance that he wanted to leave work to go to the doctor, but Vance refused, saying, "Why don't you just quit?"  [Id. at 185, 207-08].  The Plaintiff eventually saw a doctor later that day, and the doctor recommended that he not work over the weekend.  [Id. at 188].  Upon returning to work on Monday, January 9, 2006, the Plaintiff reviewed the work schedule for the coming week and saw that he was scheduled to work some 12-hour days and until 9 p.m. four days that week.  [Id. at 188]. The Plaintiff testified that when he complained to Vance about the schedule, Vance replied, "Why don't you tell the manager?  You're being a baby, baby – oh nigger, nigger."  [Id. at 188].[3]  The Plaintiff complained to

---

[3]Vance denies having made this remark to the Plaintiff.  [Vance Aff., Doc. 30 at ¶6].  Once again, Plaintiff's admitted (almost complete) lack of understanding of English, taken with the bizarre syntax of the alleged epithet, stretches the limits of what a reasonable jury could believe.  For the purposes of this motion, however, the Plaintiff's version of the facts must be taken as true.

Davenport that day about the schedule, but he admits that he did not mention Vance's use of racial epithets to Davenport.  [Id. at 192].

At some point, the Plaintiff scheduled an appointment with the Equal Employment Opportunity Commission ("EEOC") for Thursday, January 12, 2006.  The Plaintiff had received permission from Vance to leave at noon on January 12, but the Plaintiff admits that he had not told Vance or anyone else the reason why he needed to leave early.  [Id. at 167].  On the morning of January 12, Vance asked the Plaintiff not to leave until one o'clock, which was when the other tailor, Goncharova, was scheduled to begin work.  [Lopez Dep. Vol. II, Doc. 22-5 at 32].  The Plaintiff said that would be no problem, and he called the EEOC to reschedule his appointment.  [Id.].  The Plaintiff was advised by the EEOC investigator that she would be available until 3:00 p.m.  [Id. at 32; Lopez Dep. Vol. I, Doc. 22-2 at 167].

On the afternoon of January 12, the Plaintiff was alone at the University Target store with Cobb and Murphy.  [Id. at 35].  At 1:00 p.m., the Plaintiff began gathering his things to leave.  [Murphy Aff., Doc. 29 at ¶7].  Goncharova, however, had not yet arrived for her shift.  Murphy asked the Plaintiff, "Oh, Lucas, do you have to leave?"  The Plaintiff replied that

he did.  [Lopez Dep. Vol. II, Doc. 22-5 at 36].  The Defendant asserts that Murphy directed him to stay at work until Goncharova arrived, a fact which the Plaintiff disputes.  The Plaintiff testified, however, that even if Murphy had told him to wait, Murphy was only a salesperson and not a manager, thus implying that the Plaintiff was not obligated to follow Murphy's direction.  [Id.].  Goncharova did not arrive at the store until 2:00 p.m., leaving the store without a tailor for approximately one hour.  [Smith Aff., Doc. 27 at ¶7; Murphy Aff., Doc. 29 at ¶7].

The next morning, January 13, 2006, Smith reported this incident to Vance.  [Smith Aff, Doc. 27 at ¶8; Vance Aff., Doc. 30 at ¶11].  Vance prepared a written warning for the Plaintiff.  [Vance Aff., Doc. 30 at ¶12]. [4] The Plaintiff had never received a written warning before.  [Lopez Dep. Vol. II at 47].  He was aware that the Defendant has a progressive disciplinary policy for this type of offense and that an employee had to receive three written warnings in order to be discharged.  [Id. at 46-47, Exs. 17, 18].  The Plaintiff took the written warning home and had his wife translate it into Spanish.  [Id. at 47].

---

[4] There is not evidence of what warning, if any, was given to Ms. Goncharova.

Although the Plaintiff was scheduled to work the next day, Saturday, January 14, 2006, he did not report for work. [Id. at 51]. Plaintiff's supervisors tried to contact him several times on Saturday, [Bulsara, Doc. 24 at ¶13], but the Plaintiff refused to return their calls, [Lopez Dep. Vol. II at 52, 54]. On Monday, January 16, 2006, the Plaintiff came to the University Target store and handed Vance a letter stating that the Plaintiff was quitting due to repeated harassment and discrimination. [Lopez Dep. Vol. II, Doc. 22-5 at 70-71]. The next day, Thomas Rodriguez, a bilingual employee relations representative from the Defendant's headquarters in California, attempted to call the Plaintiff to address the allegations of harassment and discrimination raised in his resignation letter. [Id. at 71; Affidavit of Thomas Rodriguez ("Rodriguez Aff."), Doc. 31 at ¶3,4,10]. After several unsuccessful attempts to reach the Plaintiff, Rodriguez finally spoke to the Plaintiff on February 23, 2006. [Lopez Dep. Vol. II at 74-75; Rodriguez Aff., Doc. 31 at ¶10]. The Plaintiff, however, became angry with Rodriguez and ended the call after a few minutes. [Lopez Dep. Vol. II at 84-86; Rodriguez Aff., Doc. 31 at ¶¶10-11].

## VI.    The Present Litigation

The Plaintiff filed this action on December 29, 2006, asserting numerous causes of action under federal and state law.  Specifically, the Plaintiff alleges that he was subjected to a hostile and offensive employment environment and that he was constructively discharged from his employment as a result of racial and national origin discrimination in violation of Title VII, 42 U.S.C. §1981, and the public policy of the State of North Carolina as set forth in the North Carolina Equal Employment Practices Act. [Doc. 2 at 5].  He further alleges that the Defendant's conduct was so outrageous as to constitute intentional and/or negligent infliction of emotional distress. [Id. at 6].  The Plaintiff also alleges that the Defendant's failure to train and supervise its managers and supervisors properly resulted in a hostile and abusive work environment based on race or perceived race and national origin such that the Defendant is liable for the negligent supervision of its supervisors and managers under North Carolina law. [Id.].  Finally, the Plaintiff alleges that the Defendant failed to pay the Plaintiff for overtime hours worked, in violation of the Fair Labor Standards Act and the North Carolina Wage and Hour Act.  [Id. at 6-7].

**DISCUSSION**

## I.    Claims under Title VII and 42 U.S.C. §1981

In order to sustain a claim for employment discrimination based on a hostile work environment, the Plaintiff must demonstrate: (1) that he was subjected to unwelcome harassment; (2) that the harassment was because of his race or national origin; (3) that the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere"; and (4) that the harassing conduct is imputable to the employer. EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 313 (4th Cir. 2008). In establishing the "severe or pervasive" nature of the work environment, a plaintiff must show not only that he "subjectively perceived the work environment to be abusive," but also that "a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." Id. at 315 (internal quotation marks and citations omitted).

"An employee is entitled to relief, even absent a formal discharge, if an employer 'deliberately' makes the 'working conditions' of the employee 'intolerable' in an effort to induce the employee to quit." Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th Cir. 1995) (quoting in part Bristow

v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)).[5]  In order to demonstrate a constructive discharge, a plaintiff must show (1) that the employer acted deliberately and was motivated by discriminatory bias, and (2) that the working conditions were objectively intolerable.  Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186-87 (4th Cir. 2004).  "Because the claim of constructive discharge is so open to abuse by those who leave employment of their own accord, this Circuit has insisted that it be carefully cabined."  Id. (quoting Paraline v. Unisys Corp., 8798 F.2d 100, 114 (4th Cir. 1989)).  Mere "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) (quoting Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994)).

---

[5]The standards applicable to claims under §1981 and Title VII are essentially the same, and therefore the same case law applies in evaluating a claim under either statute.  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (noting that elements required to prove hostile work environment claim are the same under Title VII and §1981). Long v. First Union Corp. of Va., 894 F.Supp. 933, 945 (E.D.Va. 1995), aff'd, 86 F.3d 1151 (4th Cir. 1996) ("Plaintiffs can meet their *prima facie* burden [of proving a §1981 claim] by satisfying the same burdens applicable to their Title VII claim.").

**A.      Race-Based Claims**

In his Complaint, the Plaintiff alleges that he was subjected to harassment and discrimination because of his race, which he identifies as "Dominican"[6] and/or his "perceived race," which he describes as "Negroid," [Doc. 2 at 5], though Plaintiff specifically denies being Black. [Lopez Dep. Vol. 1, Doc. 44-2 at 24-25].  The fact that the Plaintiff is Dominican, however, is a matter of his national origin, not his race.  Thus, to the extent that the Plaintiff's harassment and discrimination claims are based upon his status as a Dominican, these claims will be discussed below in the context of the Plaintiff's national origin claims.

As for the Plaintiff's claims based upon his "perceived race, Negroid," the Plaintiff has not cited to any authority that stands for the proposition that a Title VII claim based upon a person's "perceived race" is cognizable under the federal discrimination laws.  At least two other district courts have rejected claims of "perceived race" discrimination under Title VII. See Butler v. Potter, 345 F.Supp.2d 844, 850 (E.D. Tenn. 2004) (granting summary judgment on the grounds that plaintiff cannot state a claim for discrimination under Title VII due to his perceived race and/or national

---

[6]While the Plaintiff alleges in his Complaint that his race is "Dominican," in his deposition, he insisted that his race was "Latin."  [Lopez Dep., Doc. 22-2 at 24].

origin); <u>Uddin v. Universal Avionics Systems Corp.</u>, No. 1:05-CV-1115-TWT, 2006 WL 1835291, at *6 (N.D. Ga. June 30, 2006) (granting summary judgment as to Title VII claim based on perceived race or national origin discrimination). In both cases, the courts rejected claims based on perceived race or national origin on the grounds that Title VII does not contain an explicit provision for the protection of persons who are merely perceived to be part of a protected class, and that "Congress has shown, through the Rehabilitation Act and the American with Disabilities Act, that it knows how to enact legislation that protects persons who are wrongly perceived to be in a protected class." <u>Butler</u>, 345 F.Supp.2d at 850. The Court finds the rationale of these cases persuasive, and therefore concludes that the Plaintiff's Title VII claims based upon his "perceived race" should be dismissed.

While a claim under section 1981 generally is analyzed under the same standards as one brought under Title VII, <u>Spriggs</u>, 242 F.3d at 184, section 1981 is worded more broadly than Title VII so as to protect any person who belongs to a group which is "perceived to be distinguishable from white citizens." <u>Salem v. City of Pontiac School Dist.</u>, No. 81-1508, 1985 WL 12820, at *1 (6th Cir. Jan. 11, 1988). Accordingly, Plaintiff's

claim that he was perceived to be black may be cognizable under section 1981 separate from the absence of a claim under Title VII. It is not necessary for the Court to decide this issue, however. The Plaintiff's forecast of evidence of a hostile working environment based on his "perceived race" is insufficient to sustain such a claim if it exists.

To state a viable claim under section 1981, the Plaintiff "must show that 'but for' his race, ... he would not have been the victim of the alleged discrimination." Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998); see also Gilliam v. South Carolina Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007) (stating that plaintiff must show that harassment "was motivated by" discriminatory animosity). In the present case, the Plaintiff has not presented a forecast of evidence that he was subjected to harassment or constructively discharged because of his perceived race. The Plaintiff cites to only two examples of racially related incidents in support of his claim. First, the Plaintiff has presented a forecast of evidence that he was referred to as being black on two occasions. While such evidence may support the Plaintiff's contention that he was perceived to be black, merely being referred to as belonging to a certain race does not rise to the level of demonstrating racial animus. The reference to

Plaintiff's race could have completely innocuous and made under innocent circumstances, and without more facts regarding these incidents, such evidence fails to create an issue as to whether the Plaintiff's adverse treatment was motivated by a discriminatory bias. The only other incident cited by the Plaintiff which possibly implicates any racial animosity toward the Plaintiff is the incident on January 9, 2006, wherein Vance used a racial epithet. While the use of racial epithets is abhorrent and certainly nothing that is or should be condoned, this one isolated incident does not constitute a sufficient forecast of evidence that the Plaintiff was deliberately subjected to intolerable working conditions due to his perceived race. "Mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter the terms and conditions of employment to violate Title VII." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). Nor is this one isolated incident of racial animosity sufficient to show that the racial harassment that the Plaintiff allegedly suffered was so "severe or pervasive [as] to alter the conditions of employment and create an abusive atmosphere...." Sunbelt Rentals, 521 F.3d at 313. As the Supreme Court has noted, "simple teasing, off-hand comments, and isolated incidents

(unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788, 118 S.Ct. at 2283 (citation omitted).

"Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Spriggs, 242 F.3d at 185 (finding "frequent and highly repugnant" racial slurs were sufficient severe and pervasive as to create racially hostile environment) (internal quotation marks omitted). While recognizing the highly offensive nature of such a remark, the Fourth Circuit has rejected arguments that the use of such a racial slur on one singular occasion is sufficient to constitute a change in the terms and conditions of employment. See Shields v. Fed. Express Corp., 120 Fed. Appx. 956, 961 (4th Cir. 2005). This is all the more true where the Plaintiff specifically denies being a member of the racial minority toward whom such epithet would be directed. Because the Plaintiff has failed to present a forecast of evidence that he was subjected to harassment sufficiently severe or pervasive to create a racially hostile work environment, the

Plaintiff's harassment and constructive discharge claims based upon his "perceived race" must be dismissed.

## B.    National Origin

The thrust of Plaintiff's claim is that he was subjected to a hostile work environment and that he was constructively discharged due to his national origin, which he describes in the Complaint as "Hispanic/Dominican." [Doc. 2 at 5].  The Plaintiff maintains that the discriminatory acts committed against him "were in large part because of his lack of fluency in the English language," [Doc. 38 at 11], and that the Defendant "allowed its employees ... to use language fluency as a proxy for national origin in ridiculing the [P]laintiff as being stupid, worthless and of no value."  [Id. at 8].

In arguing that his lack of English fluency constitutes a characteristic of his national origin, the Plaintiff relies upon the EEOC Guidelines, which broadly define national origin discrimination "as including, but not limited to, the denial of equal employment opportunity ... because an individual has the physical, cultural or *linguistic characteristics of a national origin group*." 29 C.F.R. §1606.1 (emphasis added).  The EEOC Guidelines further recognize that individual's "primary language ... is often an essential

national origin characteristic," and therefore find "Speak-English-only" rules requiring employees to speak only English at all times in the workplace to constitute "a burdensome term and condition of employment." 29 C.F.R. §1606.7(a). Neither of these regulations, however, is applicable in the instant case. The Plaintiff does not claim that he was subjected to harassment due to a mere "linguistic characteristic," such as an accent, see, e.g., Carino v. Univ. of Okla. Bd. of Regents, 750 F.2d 815, 819 (10th Cir. 1984) (finding discrimination based on "[a] foreign accent that does not interfere with a plaintiff's ability to perform duties of the position he has been denied" to be unlawful under Title VII). Nor does the Plaintiff claim that the Defendant maintained an "English-only" policy; in fact, it is undisputed that Bulsara communicated with the Plaintiff in Spanish and that the Plaintiff was allowed to speak Spanish frequently and to use his wife as an interpreter. Rather, the Plaintiff claims that he was harassed due to his inability to communicate in and understand English. Federal courts have recognized, however, that discrimination on the basis of an individual's inability to speak English does not constitute national origin discrimination. "Language and national origin are not interchangeable." Napreljac v. John Q. Hammons Hotels, Inc., 461 F.Supp.2d 981, 1029

(S.D. Iowa 2006), aff'd, 505 F.3d 800 (8th Cir. 2007). Further, "[t]here is nothing in Title VII which protects or provides that an employee has a right to speak his or her native tongue while on the job." Long v. First Union Corp. of Va., 894 F.Supp. 933, 941 (E.D. Va. 1995), aff'd, 86 F.3d 1151 (4th Cir. 1996); see also Hanoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1048 (8th Cir. 2003) ("criticizing a foreign employee's facility with the English language [does not] constitute[] discrimination against a particular race or national origin"); Velasquez v. Goldwater Mem'l Hosp., 88 F.Supp.2d 257, 262 (S.D.N.Y. 2000) ("Classification on the basis of language does not by itself 'identify members of a suspect class' and would not support an inference of intentional national origin discrimination."); Betances v. Prestige Decorating & Wallcovering, Inc., No. 05 Civ 4485, 2006 WL 963877, at *2 (S.D.N.Y. Apr. 13, 2006) ("non-English speakers ... are not a protected class under Title VII.").

The majority of the incidents alleged by the Plaintiff as contributing to a hostile work environment do not relate to the Plaintiff's Hispanic or Dominican national origin but rather relate to the Plaintiff's inability to speak and understand English when such was needed in the performance of his job. Such evidence does not constitute evidence of national origin

harassment.  The only other evidence upon which the Plaintiff relies to show harassment specifically related to his national origin is the Plaintiff's opinion testimony that Smith did not treat him well because Smith believed him to be Puerto Rican.  As an example of Smith's discriminatory bias, the Plaintiff testified that Smith once commented to the Plaintiff that he used to work with a Puerto Rican whose initials spelled an obscenity.   Even assuming, for the sake of the argument, that this comment could be construed as a disparaging remark regarding the third person's Puerto Rican or Hispanic origin, this singular comment is hardly adequate to create a question of fact as to whether the Plaintiff was subjected to a hostile work environment due to being Hispanic.

Upon careful review of the all of the evidence presented, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that the Plaintiff was subjected to a hostile working environment and/or constructively discharged "because of" his national origin.  Furthermore, while the Plaintiff has presented evidence that he subjectively found the work environment to be abusive, the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that a reasonable person in the

plaintiff's position would have found the environment to be objectively hostile, abusive or intolerable.  For these reasons, the Plaintiff's harassment and constructive discharge claims based upon his national origin must be dismissed.

## III.    Plaintiff's State Law Claims

### A.    NCEEPA Claim

The North Carolina Equal Employment Practices Act, N.C. Gen. Stat. §143-422.1*, et seq.* ("NCEEPA") provides, in pertinent part, as follows:

> It is the public policy of [North Carolina] to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers who regularly employ fifteen or more employees.

N.C. Gen. Stat. §143-422.2.  North Carolina law provides an employee with a private cause of action pursuant to this public policy provision only where the alleged discrimination resulted in the employee's termination.  See Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000) (no private right of action for harassment under NCEEPA in the absence of termination); McFadden v. Trend Community Health Services, 114

F.Supp.2d 427, 430 (W.D.N.C. 2000) (no private right of action for constructive discharge under NCEEPA). Because the Plaintiff was not terminated from his employment in this case, his claims pursuant to the public policy as stated in N.C. Gen. Stat. §143-422.2 must be dismissed.

## B. Intentional and Negligent Infliction of Emotional Distress

To assert a claim for intentional infliction of emotional distress, a plaintiff must demonstrate "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 488, 340 S.E.2d 116, 119 disc. review denied, 317 N.C. 334, 346 S.E.2d 140 (1986). "It is a question of law for the court to determine, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery." Id. at 490, 340 S.E.2d at 121. As the North Carolina Court of Appeals has stated:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities .... [P]laintiffs must necessarily be expected and required to be hardened to a certain

amount of rough language, and to occasional acts
that are definitely inconsiderate and unkind.

Briggs v. Rosenthal, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (quoting

Restatement of Torts §46, cmt. d), disc. review denied, 314 N.C. 114, 332

S.E.2d 479 (1985).

The Plaintiff argues that a reasonable jury could find that the

Defendant's treatment of the Plaintiff was "so outrageous and intolerable

that a reasonable person in the plaintiff's unique circumstance would have

no choice but to resign." [Doc. 38 at 9]. Specifically, the Plaintiff cites

several incidents as evidence of outrageous conduct: the ridicule he

received from his co-workers, such as repeatedly being called "dumb" and

"stupid"; Smith's locking the plaintiff in the building; Smith's comment

regarding the other Puerto Rican employee's initials spelling an obscenity;

requiring the Plaintiff to work until 9:00 p.m. four nights in a row following a

week when he had become ill from stress; the Plaintiff's "feeling he was not

properly paid for overtime hours"; and Vance asking the Plaintiff, "Why

don't you just quit?" when the Plaintiff complained of chest pains.

Taking all of the Plaintiff's allegations as true and viewing the

evidence in the light most favorable to him, the Court determines that the

Plaintiff has presented evidence that he was subjected to unkind and rude

remarks – that is to say, "mere insults and indignities," which do not rise to the level of outrageous conduct.  <u>Fieldcrest Cannon, Inc. v. Fireman's Fund Ins. Co.</u>, 124 N.C. App. 232, 252, 477 S.E.2d 59, 72 (1996), <u>disc. review denied</u>, 348 N.C. 497, 510 S.E.2d 383 (1998).  Further, the Plaintiff's allegation that the Defendant failed to pay the Plaintiff for overtime hours, even if accepted as true, can hardly be regarded as conduct that is "atrocious" or otherwise "utterly intolerable in a civilized community."  <u>Briggs</u>, 73 N.C. App. at 677, 327 S.E.2d at 311.

Finally, the Plaintiff's argument regarding Smith's actions in locking the Plaintiff in the building is an exaggeration of his forecasted evidence. The Plaintiff contends in his brief that he was physically locked "in the building with a chain lock from which he had no escape in case of fire." [Doc. 38 at 9].  This is completely without factual support.  The Plaintiff himself explained in his deposition that Smith locked the front door when he left to make deposits at the bank.  There is nothing in the record to suggest that Smith intended to imprison or otherwise punish the Plaintiff by this act, or that the Plaintiff had no means of escape in case of fire.  Smith had a perfectly legitimate business reason for locking the front door when he left to make a bank deposit: to keep unauthorized persons out while the

front of the store was left unattended.  Smith's conduct in so doing cannot be said to have "go[ne] beyond all possible bounds of decency," nor should his conduct be "regarded as atrocious, and utterly intolerable in a civilized community."  See id.  Accordingly, Plaintiff's claim for intentional infliction of emotional distress must be dismissed.

The Plaintiff's claim for negligent infliction of emotional distress fares no better.  To prove a negligent infliction claim, a plaintiff must show: "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as 'mental anguish'), and (3) the conduct did in fact cause the plaintiff severe emotional distress."  Johnson v. Ruark Obstetrics and Gynecology Associates, P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).  The North Carolina Supreme Court has defined "severe emotional distress" in this context as "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so."  Id.

At this stage in the proceedings, the Defendant does not challenge the Plaintiff's claim that he suffers from such severe emotional distress. [Doc. 21 at 21-22]. The Defendant argues, however, that the facts do not support an inference that the Plaintiff's severe emotional distress was the reasonably foreseeable result of any conduct by the Defendant or its employees. The Court agrees. To sustain a claim for negligent infliction of emotional distress, it must be reasonably foreseeable that the defendant's negligent conduct will result in the infliction of severe emotional distress upon the Plaintiff. <u>Id.</u> In the present case, the forecast of evidence presented by the Plaintiff does not support an inference sufficient for a reasonable jury to find that the Plaintiff's emotional distress was a reasonably foreseeable result of any negligence on the part of the Defendant or its employees. <u>See</u> <u>Robblee v. Budd Services, Inc.</u>, 136 N.C. App. 693, 797, 525 S.E.2d 847, 850 (2000). As such, the Plaintiff's claim for negligent infliction of emotional distress must fail.

## C.    Negligent Supervision

To assert a claim for negligent supervision, a plaintiff must prove "that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to

know of the employee's incompetency."  Smith v. Privette, 128 N.C.App. 490, 494-95, 495 S.E.2d 395, 398 (1998).  For the reasons already stated, the Court concludes that the Plaintiff has failed to present a forecast of evidence that any of the alleged actions taken against him were tortious. As there are no underlying tortious acts which injured the Plaintiff, the Plaintiff's claim for negligent supervision also must fail.

## IV.    Wage and Hour Claims

The Plaintiff claims that he was not compensated for overtime hours that he worked, in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §201, et seq. ("FLSA"), and the North Carolina Wage and Hour Act, N.C. Gen. Stat. §95-25.1, et seq.  The Defendant moves for summary judgment on the grounds that the Plaintiff has failed to present any evidence to support his wage and hour claims.  [Doc. 21 at 22-23].

The Plaintiff's response brief completely fails to address the Defendant's arguments regarding these wage and hour claims.  The Plaintiff has presented no admissible facts[7] or legal argument in opposition

---

[7]The only reference in the Plaintiff's response brief to his wage and hour claims is contained in his citation to the testimony of Plaintiff's psychological therapist, Max Nunez, in which Mr. Nunez mentions that the Plaintiff related to him during therapy that he was not being compensated for overtime.  [Doc. 38 at 18].  Such testimony,

to the Defendant's request for summary judgment. "[A] party's failure to raise an issue in ... opposition to summary judgment constitutes a waiver of that issue." Estate of Weeks v. Advance Stores Co., 99 Fed. Appx. 470, 474 (4th Cir. 2004); see also Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 670 (1st Cir. 1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.") (quoting Vaughner v. Pulito, 804 F.2d 873, 877 n.2 (5th Cir. 1986)).

In order to hold an employer liable under the FLSA for unpaid overtime wages, a plaintiff must show: (1) "that he worked overtime hours without compensation" and (2) "the amount and extent of his overtime work as a matter of just and reasonable inference." Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986). Only if the plaintiff satisfies this initial burden does the burden shift to the employer to produce records of hours worked and wages paid. Pforr v. Food Lion, Inc., 851 F.2d 106, 108 (4th

---

however, fails to create a genuine issue of material fact as to whether the Plaintiff in fact worked overtime for which he was not paid, as Mr. Nunez's statement is clearly hearsay testimony which cannot be considered in the context of this summary judgment motion. See Maryland Highway Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991) ("several circuits, including the Fourth Circuit, have stated that hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment").

Cir. 1988). In the present case, the Plaintiff has made no specific allegations and presented no evidence regarding the numbers of hours that he worked without pay or the amount of wages that he is owed. While the Plaintiff testified that he would stay 30 or 45 minutes after his shift ended in order to complete alterations for customers without compensation, the Plaintiff has presented no evidence as to when such incidents occurred or with what frequency. Nor has the Plaintiff produced any evidence to support his contention that his hours were altered in the computer system or to what degree. On the other hand, the Defendant has presented uncontroverted evidence that while the computer software utilized by the Defendant to track employees' time allows management to go into the system in order to adjust an employee's time, such as when an employee forgot to clock in or out, [Lundblad Aff., Doc. 26 at ¶5], the system always alerts the employee that an alteration and gives the employee the opportunity to agree or disagree with the change. [Id.]. All time cards include not only a list of the times when the employee clocked in or out, but also all changes that were made to the time record. [Id.]. Thus, if changes were made to the Plaintiff's time records, then such changes would be noted therein. The Defendant has produced a copy of

all of the Plaintiff's time records to the Court, and the only changes made to the Plaintiff's time records are instances wherein the Plaintiff forgot to clock in or out or was unable to do so because the computer was offline and a manager subsequently entered the time that he began or ended his shift. [Id. at ¶7, Ex. B]. There is no indication in these records that any of the Plaintiff's time records were altered improperly, or that the Plaintiff worked overtime for which he was not compensated. For these reasons, the Court concludes that the Plaintiff's claim for unpaid compensation under the FLSA must be dismissed.

With respect to the Plaintiff's state law claim for unpaid overtime, the North Carolina Wage and Hour Act provides that certain provisions of the Act, including the overtime provision, is not applicable to "[a]ny person employed in an enterprise engaged in commerce or in the production of goods for commerce as defined in the Fair Labor Standards Act." N.C. Gen. Stat. §95-25.14(a)(1). Because it is undisputed that the Defendant is an enterprise as defined by the FLSA [Doc. 2 at 2], the overtime provision of the North Carolina Wage and Hour Act is not applicable to the Plaintiff. See Spencer v. Hyde County, 959 F.Supp. 721, 728 (E.D.N.C. 1997) ("if a defendant is covered by the FLSA, it is exempt from the state statute");

<u>Amos v. Oakdale Knitting Co.</u>, 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992) ("Businesses covered by the FLSA are exempt form the state Wage and Hour Act").  Accordingly, the Plaintiff's Wage and Hour Act claim is also dismissed.

**O R D E R**

For the foregoing reasons, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 20] is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**, and judgment shall issue simultaneously herewith.

**IT IS SO ORDERED**.

Signed: July 10, 2008

Martin Reidinger
United States District Judge